SCHOOL DISTRICT No. 16, IN STANTON COUNTY, APPELLEE, v. THE STATE BANK OF NEBRASKA, APPELLANT.

**Sale on Pledge by Banker or Broker.**—Where school district bonds, intrusted to a bank for sale on account of such district, are sold or pledged by the bank on its own account to an innocent holder, for value, such sale or pledge will bind the district. *Held*, however, upon the facts in this case, that the defendant had acquired no property in the bonds, either general or special, and that the school district was not estopped from bringing an action to compel their surrender.

THIS was an appeal by defendant from a decree rendered against it in the district court for Douglas county,

directing said defendant to deliver up certain school district bonds issued by the plaintiff, and placed in the hands of R. G. King & Co., bankers at Stanton, Neb., and by them delivered to defendant.

*John D. Howe* for appellant.

These bonds are negotiable and subject to the law of commercial paper. Had King stolen the bonds, inasmuch as they on their face necessarily show title in the holder, he could have transferred a good title to an innocent purchaser. *Welch v. Sage,* 47 N. Y., 143. *Murray v. Lardner,* 2 Wall., 118, 121. *Dinsmore v. Duncan,* 57 N. Y., 577. *Colson v. Arnot,* 57 N. Y., 268. *Cent. L. J.* April 6, 1877, p. 315. *California v. Wells,* 15 Cal., 336. *Spencer v. Holmes,* 102 Mass., 503. *Smith v. County,* 54 Missouri, 58. The district claims that it left the bonds with King for sale. Southard claims they were left with *him,* though his letter enclosing them to the bank is signed R. G. King & Co. King was the only person in the concern. Every one of the witnesses tells a different story on this point. Even if true that King & Co. took them as agents to sell, the district, on the general principles of the law of agency and estoppel, is concluded from claiming that the appellant should lose by the act of King & Co., though strictly unauthorized as between the principal and agent. The district chose its own agent; it invested him with the legal title and apparent ownership of the bonds. It cannot disclaim his acts after he has been allowed to go into the market and to show to the world that he was the owner of the bonds, as against parties who have honestly dealt with him believing him to be the owner of them. If any loss ensue it must be borne by the district, because, if one of two innocent persons must suffer, it must be the one whose fault led to the loss. In short, the district

is estopped from saying that King was not the owner as to innocent parties dealing with him, or that King could not have done what the owner could have done with the property. 1 Pars. Cont., 39, 44. Story's Agency, §§ 127, 133, 73, 224. *James v. Pohlman,* 15 Am. L. Reg. (N. S.), 316. *Reynolds v. Kenyon,* 5 Am. L. Reg. (N. S.), 181. *Doubleday v. Kress,* 11 Am. L. Reg. (N. S.), 123. *Dows v. Greene,* 16 Barb., 72. *Lyell v. Sanbourn,* 2 Mich., 109.

*R. F. Stevenson* and *Carrigan & Osborn,* for appellee.

If King was the agent of the school district, he still had no power to surrender or pledge the property of his principal in payment of his own debts, and the rule is the same when applied to negotiable security as to any other species of property. We concede that if the securities were negotiable and sold to an innocent purchaser for value, or deposited with an innocent party to secure *future* advancements, the principles of the law merchant would apply, but the purchaser must be innocent, *absolutely* the purchase must be for value, or the hypothecation based on a valid agreement for future advance. There is no agreement on the part of the bank to advance King & Co. money on the strength of the deposit of the bonds. The bonds were not pledged as collateral security by King, or any person acting for him. King could not contract in relation to the bonds on the 24th of September, being in utter ignorance of the real ownership.

COBB, J.

The testimony in this case is considerably conflicting, both as to the manner in which the school district bonds came into the hands of R. G. King & Co. and the purpose for which they were placed in the State

Bank of Nebraska. But it appears with sufficient clearness that they were placed in the hands of R. G. King & Co., who were then local bankers in that section of country, for the purpose of being sold on account of the school district, and any disposition which King & Co. made of the bonds will be binding upon the school district. But did they make any disposition of them whereby the State Bank acquired a property in them, either general or special? The court below found that they never did, and upon a careful examination of the testimony we think the finding correct. The bank of R. G. King & Co. were (generally) indebted to the State Bank of Nebraska, and were in the habit of putting up collaterals with said State Bank, from time to time, to secure such indebtedness, and had some collaterals in the said bank for that purpose when, on the 16th of September, 1873—King himself being absent—his clerk received the bonds in question from the school district and sent them to the State Bank at Omaha, by mail. With them he sent a letter of transmittal, which, so far as it related to the bonds, was in the following words: "We enclose two Stanton County S. D. bonds, $600 in all; have sent for county clerk's certificate, and will forward as soon as I receive it. What is the best you can do with them?"

At this time King was not at home, having passed through Omaha four days before on his way to St. Louis. His business at St. Louis was to get money with which to pay his balance to the State Bank, and as he passed through Omaha he informed the bank of his object and hopes in regard to getting money at St. Louis; also that he had instructed Southard (his clerk), whom he had left in charge of his business at West Point, to send to the State Bank additional collaterals. Now when the bank received these bonds, with the letter of transmittal, had they, the officers of

the bank, the right to consider them sent to be held by the bank as collateral security in pursuance of the said instruction from King to Southard, and did they as a matter of fact so understand it? We are obliged to answer both questions in the negative.   The language of the inquiry contained in the letter of transmittal, "What is the best you can do with them," forbids any such construction.    The cashier of the bank, when asked on the witness stand the meaning of these words, answered: "He would want me to give him a rate, whether eighty-five cents, or whatever we agreed on, it would go to his credit."   Nothing about collateral here.   If further evidence, that the bank officers did not at the time understand that these bonds were sent to them by King & Co. to be held as collateral was wanting, it is to be found in the letter which they wrote on the 19th (three days after), as testified to by the cashier, as follows: "I wrote him" (Southard, King's clerk, then at the bank at West Point) "that 'Mr. King had told me he would send collaterals,' and asked him, '*why he did not send them?*'"   Would he have used this language if he had received the considerable sum of six hundred dollars less than three days before, which he had not acknowledged?   We think not.   Again, if evidence was wanting to prove that Southard did not send the bonds to the State Bank, to be held as collateral security for King & Co's overdrafts, it is found in the letter which he wrote in reply to the above letter, dated September 22, before the return of King from St. Louis, in which he says, "I have never received any notice to send collaterals."   If the defendant's theory of this case were correct, would he have used this language? Would he not rather have said, "I have already sent you S. D. bonds to the amount of six hundred dollars. Why don't you acknowledge their receipt?"

The only remaining question is, did King upon his

return from St. Louis change the character of this transaction so as to give the State Bank a special property in these bonds? King swears positively that he did not, and we have examined the testimony of each of the officers of the bank in vain for any positive assertion that he did. King called at the bank upon his return from St. Louis, having failed to get funds there, and had an interview with the officers of the bank about the state of his account. Certain collaterals of his which the bank held were looked over by him and the officers of the bank, and the witnesses say that they were all considered and spoken of as collaterals. The cashier in his testimony says: "We showed him collaterals we had on hand, and then we showed him these bonds. He wished us to buy them, but we told him we could not, that we had no market for them."

Q. What did he say with reference to your holding them as collateral?

A. We held them as collateral for his account to pay his checks with.

If King said anything at this interview, which amounted to the placing of these bonds as a collateral security for his account, or advances either past or future, the evidence fails to show it, and finally, as if to render it impossible for us to believe that the bank officers, either before or immediately after this interview with King, considered that these bonds had been pledged to the bank as collateral security, we have a copy of a letter written by the cashier to R. G. King & Co., dated September 24, and written, as the cashier testifies, after the interview with Mr. King at the bank, in which he says: "I note contents of yours of the 16th in re-regard to S. D. bonds and warrants. We are not buying warrants just at present, *and do not want the S. D. bonds.*"

The decree of the district court is affirmed.

DECREE AFFIRMED.